RENDERED: APRIL 18, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0158-MR

DEMETRIUS ROBERSON                                       APPELLANT

ON APPEAL FROM LOGAN CIRCUIT COURT

V.                  HONORABLE JOE W. HENDRICKS, JR., JUDGE
NO. 17-CR-00220

COMMONWEALTH OF KENTUCKY                       APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A Logan County jury convicted Demetrius Roberson of one count of murder, one count of robbery in the first degree, nine counts of wanton endangerment in the first degree, and one count of attempted murder. Roberson was sentenced to life without parole for twenty-five years. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Logan Circuit Court.

**I. BACKGROUND**

Between midnight and 1:00 a.m. on August 21, 2016, two men, dressed in all black and with their faces covered, entered the apartment of Lexus Bell (Bell) in Russellville, Kentucky. One man was shorter, and one was taller. The shorter man went into the back bedroom where Bell was located with her baby

son. The shorter man fired a warning shot and then backed out of the bedroom, closing the door. He then fired five shots toward the bedroom. One of those gunshots went through the door and hit Bell, killing her. The taller man stayed in the front of the apartment with his gun pointed at Estoria Mordica, who was Bell's boyfriend's sister.

Also in the apartment were five of Bell's juvenile siblings, Estoria, and Estoria's three children. In all, eleven people were located in the two-bedroom apartment. As he left the apartment, the shorter man fired five additional shots, at least some of which were aimed towards Estoria and her children. In total, eleven shots were fired in the small apartment.

The Commonwealth's theory of the case centered around Reba Kirk (Kirk). Kirk was a resident of the Robinwood Apartments, the same apartment complex where Bell lived. Kirk sold marijuana from her apartment. Zach Mordica (Mordica), Bell's boyfriend, sold marijuana from Bell's apartment. Jordan Lunsford (Lunsford), Kirk's nephew and the boyfriend of Antoinette Wynn (Wynn), Bell's sister, stayed back and forth between Kirk's apartment and Bell's apartment.

In February of 2016, Kirk went on a trip to Atlanta. While she was gone, she left her drug dealing business in the hands of Lunsford. When she returned, her money and her drugs "weren't right." Eventually, Kirk determined that Mordica had taken her drugs and money, and Kirk was angry.

At the end of July of 2016, Kirk and Roberson began messaging on Facebook and, according to Kirk, subsequently began a sexual relationship.

2

Kirk testified that one day Roberson told her that he wanted to "hit a lick," which meant that he wanted to rob someone. Kirk suggested that they rob Mordica because she wanted her money back from the February incident. She testified that the robbery was not discussed again until the night that it occurred.

Kirk testified that on the night of August 20, 2016, she was at Roberson's mother's trailer in Bowling Green, where Roberson also lived. Roberson stepped out of the room to use the phone, and when he returned, he told Kirk to ask his mother to borrow her car. Kirk did so, and Roberson directed her to an apartment in Bowling Green. Roberson went into the apartment and came back outside with two men whom Kirk did not know. These two men were eventually identified as Tayveon Bibb and Deon Young.

According to Kirk, the foursome then went to the Robinwood Apartments. Kirk went into her apartment while the three men went towards Bell's apartment. Bibb had second thoughts and returned to the car, and Roberson and Young went into the apartment dressed in all black and wearing masks. After the robbery, Roberson called Kirk to pick them up, and she did so. Kirk testified that Roberson got into the car carrying a black bag. Kirk then dropped off Bibb and Young where she picked them up in Bowling Green. Then she drove Roberson to a storage unit, where he deposited the bag. Then, they went back to Roberson's mother's trailer.

Kirk described Roberson's demeanor back at the trailer variably as "hysterical," "frantic," and "hyper." Roberson told Kirk that his "ears were

3

ringing, and he thought he killed her." Kirk testified that neither she nor Roberson slept very much that night and the next day, she told Roberson's mother that they had gone to Russellville the night before. Roberson became very angry and told his mother to take Kirk to her mother's house. Kirk testified that Roberson threatened to kill her if she ever told anyone what happened and that the relationship ended after that.

The Commonwealth presented voluminous other evidence to support its theory of the case, including testimony from Young and deposition testimony from Bibb, who had died before the trial. The Commonwealth also presented evidence that the murder weapon was found in a bag in the car of LaVonsaye Roberson (LaVonsaye), Roberson's wife.[1] While the evidence presented through the testimony of each of the witnesses was not entirely consistent regarding many of the details, it largely followed the general story as described by Kirk.

Roberson, on the other hand, presented evidence that he was at his mother's house with numerous members of his family on the night of the shooting and that he never left. Several family members testified to this alibi defense. Throughout the trial, he also sought to impeach the Commonwealth's witnesses, questioning their credibility and their motives to lie.

After hearing the evidence, the jury convicted Roberson of the murder of Bell, the attempted murder of Estoria, and wanton endangerment in the first degree as to each of the children in Bell's apartment at the time of the shooting.

---

[1] At the time of the shooting, LaVonsaye was not yet Roberson's wife but was merely his girlfriend. Her maiden name was LaVonsaye Wilkerson.

4

The trial court sentenced Roberson to life without parole for twenty-five years. Additional facts are discussed as needed for our analysis.

## II. ANALYSIS

Roberson alleges several errors by the trial court and urges this Court to reverse his convictions. First, he argues that the trial court erred in excluding evidence that another man, Quinton Posey, admitted shooting Lexus Bell. Next, he argues that the trial court erred in admitting deposition testimony of Tayveon Bibb. He also argues that the trial court erred in excluding testimony regarding why Roberson broke up with his child's mother. He next argues that the Commonwealth improperly called his mother a liar and accused her of committing perjury during her cross-examination. He also argues that the trial court erroneously excluded evidence that his family attempted to provide police with exculpatory evidence. Roberson also argues that the trial court erroneously failed to sequester the jury during its guilt phase deliberations. Next, he argues that the trial court erred in allowing the jury to review only a portion of a witness's testimony and not the entirety of that testimony. Finally, he asserts that the jury returned inconsistent verdicts as to his recommended sentence, and that the trial court erred in imposing the longer of the two sentences. We address each of Roberson's arguments in turn.

## A. Quinton Posey Admission

Roberson first argues that the trial court erred in excluding testimony from a defense investigator that Kelsey Hampton had told the investigator that she had heard Quinton Posey admit that he shot Bell. He argues that Posey's

5

admission was not hearsay, as it was not offered for the truth of the matter asserted but instead was offered as evidence that an alternative perpetrator committed the murder.[2] He further asserts that even if it was hearsay, it was admissible as a statement against interest and a verbal act by Posey. Roberson focuses his argument on his right to present a defense and argues that the exclusion of the evidence violated this right, as well as his rights to due process and a fair trial.

The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007); *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *English*, 993 S.W.2d at 945).

Posey testified on behalf of the Commonwealth. He testified that after the shooting, many people suspected he may have been involved but that he was not. On cross-examination, Roberson asked Posey if Posey knew Kelsey Hampton. Posey stated that he did not know Hampton by name but may know her if he saw her. He testified that he did not remember if he was ever at a gathering with Hampton, and he unequivocally denied that he ever said he "pulled the trigger" that killed Bell.

---

[2] In his reply brief, Roberson argues that the statement was not offered for its truth but instead to prove that Posey made such an admission. The relevancy of this admission, however, is suspect, if it is not offered for the truth of the admission.

6

During Roberson's case-in-chief, Roberson called Kelsey Hampton to testify. Hampton testified that she was married to Quinton Hampton and that she was told Quinton Hampton and Quinton Posey were cousins. Roberson asked Hampton if she was ever at a gathering with Posey, and Hampton said that she could not remember. Roberson then attempted to ask Hampton if she had heard Posey say that he "pulled the trigger" that killed Bell, but the Commonwealth objected. The trial court held a bench conference and then excused the jury so that the parties could discuss the admissibility of this evidence. Eventually, outside of the presence of the jury, Hampton stated that she could not remember whether she was ever at a gathering with Posey, could not remember if Posey ever said he "pulled the trigger," and could not remember ever speaking with a defense investigator.

After much discussion and argument, the trial court found that Posey's alleged statement that he "pulled the trigger" was inadmissible, as it was hearsay and there were no hallmarks of trustworthiness as required for its admission under Kentucky Rule of Evidence (KRE) 804(b)(3).[3] Roberson then called Jessica Shoemaker, the defense investigator, to testify by avowel. Shoemaker testified that she interviewed Hampton in July of 2018 at Hampton's home. Shoemaker testified that during that interview, Hampton told her that she was at a gathering of some sort when she heard Posey say that he

---

[3] Under KRE 804(b)(3), a statement against the declarant's interest is not excluded by the hearsay rule if the declarant is unavailable as a witness. However, "[a] statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*

7

had "pulled the trigger." Shoemaker testified that Hampton told her that she had heard Posey say this several times. Shoemaker further testified that Hampton also told her that, because of her familial relationship with Posey, she would not testify in open court but would only testify at a secret grand jury.

Following this avowel testimony, the trial court again heard arguments from the parties regarding the admissibility of Hampton's statement regarding Posey's statement. Relying on this Court's opinion in *Askew v. Commonwealth,* 768 S.W.2d 51 (Ky. 1989), the trial court again ruled to exclude the evidence.

We begin by addressing Roberson's assertion that the exclusion of this evidence violated his due process right to present a defense. "Under the United States Constitution and the Kentucky Constitution, an accused has a right to present a complete and meaningful defense." *Newcomb v. Commonwealth,* 410 S.W.3d 63, 84–85 (Ky. 2013) (citing *Brown v. Commonwealth,* 313 S.W.3d 577, 624–25 (Ky. 2010)). The right to present a defense, however, "does not 'abrogate the rules of evidence.'" *Id.* at 85 (quoting *McPherson v. Commonwealth,* 360 S.W.3d 207, 214 (Ky. 2012)). The exclusion of evidence, even pursuant to the rules of evidence, violates a defendant's constitutional rights when the exclusion "significantly undermines fundamental elements of the defendant's defense." *Id.*

In this case, Roberson's defense was that he was innocent of the crime and had been set up. Throughout the trial, he put forth evidence that the witnesses against him had motive to lie and that several other people had a motive and/or an opportunity to commit the murder. He further put forth

8

substantial alibi evidence. The exclusion of Posey's single statement that he "pulled the trigger" did not "significantly undermine[] fundamental elements" of Roberson's defense, especially considering that Posey's statement could only come into evidence through multiple layers of hearsay. *Id.*

Under KRE 801(c), "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." KRE 802. In order for Posey's statement that he "pulled the trigger" to have any relevance to the case at bar, it must have been offered for its truth—that Posey did, in fact, "pull the trigger" and kill Lexus Bell. It was not a verbal act, as Roberson asserts. We have explained the verbal act doctrine as follows,

> the verbal act doctrine, which provides that the statements are not hearsay evidence because they are "not admitted for the purpose of proving the truth of what was said, but for the purpose of describing the relevant details of what took place." Importantly, however, the "relevancy [of such statements] does not turn on whether the information asserted tends to prove or disprove an issue in controversy, but on whether the action taken by the police officer in response to the information that was furnished is an issue in controversy. . . . The rule is that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case."

*Brewer v. Commonwealth,* 206 S.W.3d 343, 351–52 (Ky. 2006) (footnotes omitted). In this case, Posey's statement did not serve to "describe the relevant details of what took place" or to explain the actions taken by someone else after hearing Posey's statement. *Id.* Instead, it was relevant only to establish that Posey was an alternative perpetrator and had killed Bell.

9

Posey did not testify at trial that he pulled the trigger. Thus, that statement is hearsay, in that it was made out of court and offered for its truth. Further, during trial, Posey denied making the statement. Thus, Roberson sought to admit Posey's statement through Hampton's testimony, and when he was unsuccessful in doing so, sought to admit it through Shoemaker's testimony. Roberson had hoped that Hampton would testify that she heard Posey make this statement. However, during trial, Hampton testified that she could not remember if Posey made this statement. Thus, Roberson sought to introduce Hampton's prior out of court statement that she heard Posey say he "pulled the trigger." Hampton's prior statement, therefore, was also hearsay, as it was made out of court and offered for its truth.

Generally, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." KRE 805. In this case, Posey's statement that he "pulled the trigger" was inconsistent with his explicit testimony at trial that he did not shoot Bell and therefore was not excluded by the hearsay rule pursuant to KRE 801A(a)(1).[4]

Hampton's statement that she heard Posey say he "pulled the trigger," however, is not excluded from the hearsay rule. We have previously stated that

_____

[4] Under KRE 801A(a)(1), "[a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is . . . [i]nconsistent with the declarant's testimony[.]"

"[a]n inconsistent statement for purposes of KRE 801A(a)(1) includes a witness's claimed inability to recall making the statement." *Downs v. Commonwealth*, 620 S.W.3d 604, 617 (Ky. 2020) (citing *McAtee v. Commonwealth*, 413 S.W.3d 608, 618 (Ky. 2013)). However, Hampton testified not only that she could not remember making the statement but also that she could not remember even meeting with the defense investigator, could not remember attending any gathering where Posey was also present, and could not remember ever hearing Posey say that he "pulled the trigger."

The evidence Roberson sought to introduce through Shoemaker's testimony is exactly that prohibited by *Askew v. Commonwealth*, 768 S.W.2d 51,[5] which was cited by the trial court in makings its ruling. In *Askew*, we stated,

> The *Jett* rule permits impeachment of a witness who possesses personal knowledge by proof of a prior contradicting statement. When the second witness, called for the purpose of disclosing the prior contradictory statement of the first witness, denies that the statement was made, it is improper to allow attempted impeachment of him. If it were otherwise, a long succession of witnesses could be called until finally one was found who would testify that the previous witness had earlier told a different story.

*Id.* at 56.[6] We explained that the "real mischief" in admitting this hearsay within hearsay "is that a connection between [the alleged declarant] and the

---

[5] We acknowledge that *Askew* was rendered before the Kentucky Rules of Evidence were adopted. However, it has not been treated critically on this issue and remains relevant and applicable.

[6] The *Jett* rule expands the permissible use of prior inconsistent testimony from only impeachment to use as substantive evidence. *Jett v. Commonwealth,* 436 S.W.2d 788 (Ky. 1969).

11

statement attributed to him was never shown." *Id.* at 57. Because of this lack of connection, "the statement is inherently unreliable. If under the guise of *Jett* evidence such as this is admitted, the hearsay rule would pass into non-existence." *Id.*

Accordingly, the trial court did not abuse its discretion in excluding Shoemaker's testimony that Hampton told her that she had heard Posey say that he had "pulled the trigger" that killed Bell.

**B. Tayveon Bibb Deposition**

Roberson next argues that the trial court erred in admitting the deposition of Tayveon Bibb. He first argues that the trial court improperly allowed the taking of the deposition, as the Commonwealth had not presented the proof required by Kentucky Rule of Criminal Procedure (RCr) 7.10. Alternatively, he argues that the deposition testimony should have been excluded at trial because Bibb asserted his 5th Amendment rights multiple times during cross-examination and refused to answer questions. We review the trial court's admission of evidence for abuse of discretion.

*A. RCr 7.10*

> Under RCr 7.10(1),
>
> [i]f it appears that a prospective witness may be unable to attend or is or may be prevented from attending a trial or hearing or is or may become a nonresident of the Commonwealth, that the witness's testimony is material and that it is necessary to take the witness's deposition in order to prevent a failure of justice, in any pending proceeding the court may upon motion and notice to the parties order that the witness's testimony be taken by deposition[.]

12

RCr 7.10(3) also allows for the taking of a deposition or the use of a deposition "by agreement of the parties."

Roberson argues that he did not agree to the taking of Bibb's deposition and that the Commonwealth did not offer the required evidence under RCr 7.10(1). He asserts that the Commonwealth only argued that because of Bibb's prior record and the dangerous nature of his past criminal acts, he might not be available for trial. He argues that no proof was offered that Bibb would actually be unable to attend trial and testify or that his deposition was necessary to prevent a failure of justice.

The Commonwealth, on the other hand, argues that Roberson's agreement to the deposition was immaterial because Bibb agreed to the deposition as part of the plea agreement in his own case. Thus, the Commonwealth and Bibb, the only two parties to Bibb's criminal case, both agreed to the deposition, which satisfied RCr 7.10(3).

To begin, we disagree with the Commonwealth's contention that Bibb's agreement to the deposition was sufficient, and that Roberson's agreement was not required to satisfy RCr 7.10(3). The term "parties" as used in the rule refers to the "parties" to the "pending proceeding" where the deposition is sought to be used, not the "parties" to some collateral proceeding. As such, the "parties" that were needed to agree to the taking of Bibb's deposition, to be used in the "proceedings" against Roberson, were Roberson and the Commonwealth. Roberson did not agree, and therefore, RCr 7.10(3) was not satisfied. Thus, we must determine whether the requirements of RCr 7.10(1) were met.

13

In this case, although it does not appear the Commonwealth filed a formal motion, the issue of Bibb's deposition was repeatedly addressed by the parties and the trial court. The trial court entered a written order which stated,

> After much discussion, and in consideration of the criminal history of Taveon [sic] Bibb recited in a previous order, plus information that he was shot prior to the incident that gave rise to charges in this case, the Court found that there would be a substantial risk that Taveon Bibb, if released from custody, may not be available for trial. This is both because of the pattern of his decision making suggested by the criminal history and the risk from others that may be inherent in his lifestyle to date. . . . The purpose of this order is to preserve the testimony of Mr. Bibb for use at trial in the event he is released from custody and is unavailable at time of trial.

Subsequent to this order and prior to Bibb's deposition and final sentencing in his own case, Roberson moved to have Bibb held as a material witness pursuant to RCr 7.06. In addressing that motion, the trial court found,

> Mr. Bibb is an indispensable witness and his deposition is being taken today for that reason. . . . Even though Mr. Bibbs [sic] deposition is being taken to preserve his testimony in the event he becomes unavailable for trial, it is in the interest of justice that he be personally present at trial.. . . [T]he facts concerning risk are known to the Court from having reviewed Mr. Bibb's bond and Pre-sentence investigation.

The court then imposed a $1000 cash bond and a curfew with the requirement that Bibb reside with his sister in Bowling Green.

Pursuant to the trial court's orders and after the Commonwealth provided notice to Roberson, Bibb's deposition was taken. Roberson was present at the deposition and participated, including by cross-examining Bibb.

We have previously held that "it was facially within the trial judge's discretion under RCr 7.10(1) to order the parties to depose a witness[.]" *Lovett*

14

*v. Commonwealth*, 103 S.W.3d 72, 82 (Ky. 2003). In this case, based on the trial court's findings in its two orders, the trial court did not abuse its discretion in ordering Bibb's deposition be taken.

*B. Assertion of Fifth Amendment Rights*

Roberson also argues that the trial court erred in admitting Bibb's deposition testimony because Bibb invoked his Fifth Amendment privilege against self-incrimination and refused to answer several questions during cross-examination. He argues that this invocation would have prevented Bibb from testifying live during the trial, had he been available, and therefore should have resulted in the exclusion of his deposition from evidence. He asserts that the erroneous admission of Bibb's deposition violated his rights to due process, fundamental fairness, and to confront witnesses, in violation of both the Kentucky and the United States Constitutions.

The Commonwealth, on the other hand, argues that a witness's invocation of the Fifth Amendment privilege on collateral issues does not require striking the entirety of his testimony. It further argues that even if the trial court did err, this error was invited, as all invocations were made during the portion of Bibb's deposition played by Roberson.

Finally, in response, Roberson argues that the matters on which Bibb invoked his privilege against self-incrimination were not collateral and that Roberson did not invite the error.

On October 27, 2021, the Commonwealth filed a Notice of its intent to use Bibb's deposition at trial, as Bibb had died on January 10, 2021. Roberson

15

objected to the admission of the deposition. Roberson raised the same arguments to the trial court that he makes today.[7]

Generally, "a deposition, so far as otherwise admissible under the rules of evidence, may be used" at a trial if "the witness is dead." RCr 7.20(1). However, "the prosecution may not call a witness knowing that the witness will invoke the Fifth Amendment immunity." *Clayton v. Commonwealth*, 786 S.W.2d 866, 868 (Ky. 1990). Nevertheless, a witness who "will testify as to some matters but not as to others should ordinarily be allowed to take the stand." *Adkins v. Commonwealth*, 96 S.W.3d 779, 789 (Ky. 2003) (citing *Combs v. Commonwealth,* 74 S.W.3d 738, 742–43, 745 (Ky. 2002)). "If the prosecution witness refuses to answer questions on cross-examination, the defendant's proper remedy is a motion to strike all or part of the witness's direct testimony." *Id.* Because Bibb's deposition was taken pretrial and the Commonwealth sought to admit it at trial, Roberson's motion to exclude the deposition was the functional equivalent of a motion to strike all of Bibb's testimony. "The trial court's decision whether to strike all or part of the witness's testimony is reviewed for abuse of discretion." *Id.*

"[T]he federal courts have recognized that prohibiting a witness from testifying or striking the entirety of a witness's testimony is a 'drastic remedy not lightly invoked[.]'" *Combs*, 74 S.W.3d at 743. This remedy is "appropriate

---

[7] At the trial court, Roberson also argued that Bibb's deposition contained other inadmissible testimony such as improper KRE 404(b) evidence, but those claims have not been presented on appeal.

16

only where a witness's invocation of the privilege frustrates cross-examination on issues material to the witness's testimony." *Id.* at 744; *see also McRae v. Commonwealth*, 635 S.W.3d 60, 66-67 (Ky. 2021). "When cross-examination is precluded only with respect to collateral issues, the Sixth Amendment does not require the court to strike the witness's testimony." *Id.*

In this case, Roberson alleges that Bibb asserted his Fifth Amendment privilege and refused to answer questions regarding four different topics: (1) other crimes he claimed to have committed with Roberson during direct examination; (2) who shot him two weeks prior to Bell's murder; (3) whether he had "hit a lick" before, after using the term to describe a robbery; and (4) whether he committed other crimes with co-defendant Deon Young. Bibb's refusal to answer these questions, however, did not frustrate Roberson's ability to cross examine Bibb "on issues material to" Bibb's testimony. *Id.* The answers to these questions "were neither necessary to a probing cross-examination nor particularly probative as to [Bibb's] truthfulness." *Id.* at 745. Bibb's invocation of his rights "neither prevented [Roberson] from inquiring as to matters going 'to the heart of' [his] direct testimony nor constituted a refusal to be cross-examined." Accordingly, the trial court did not err in admitting Bibb's deposition testimony.

## C. Natasha Williams Testimony

Roberson next argues that the trial court erred in excluding testimony from his mother, Natasha Williams, regarding the reason for his breakup with his baby's mother, Diedra. He sought to admit evidence that he and Diedra

17

broke up because Diedra had an affair with Tayveon Bibb. The Commonwealth objected to the admission of this evidence, first on relevancy grounds and then on hearsay grounds. The trial court excluded it based on a finding that it was hearsay. We review the trial court's exclusion of this evidence for abuse of discretion. *Clark*, 223 S.W.3d at 95; *English*, 993 S.W.2d at 945. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581 (citing *English*, 993 S.W.2d at 945).

During Williams's testimony, Roberson's counsel asked her why Roberson and Diedra "had a falling out." As stated, the Commonwealth objected on relevancy grounds, and a bench conference ensued. At the bench conference, Roberson's counsel explained that Roberson and Diedra broke up because Diedra had an affair with Bibb, and that he wanted to use this information to establish that Roberson and Bibb did not get along. He further explained that the breakup occurred sometime between the birth of Roberson's child in October of 2015 and Bell's death in August of 2016. In seeking to understand the basis of Williams's knowledge about this, the trial court called her up to the bench so that the jury could not hear the conversation. At the bench conference, Williams explained that she was present when Diedra and Roberson argued about Diedra's affair with Bibb. She witnessed the argument and was trying to figure out what the two were arguing about. Eventually, she stated that both Diedra and Roberson "told" her. At that point, the

Commonwealth stated that it believed Williams's testimony was hearsay. The trial court agreed and sustained the Commonwealth's objection to the evidence.

Once back on the witness stand and in front of the jury, Williams testified that Roberson and Bibb were friends around 2015 and that they also stopped being friends sometime in 2015, which was prior to the shooting. She testified that after 2015, she never saw Bibb with Roberson again. She never testified as to the reason the friendship ended.

As previously discussed, "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). Hearsay is generally inadmissible. KRE 802. In this case, Williams never offered testimony about any specific statements made by either Roberson or Diedra. Thus, there is no specific out of court statement that Roberson sought to admit. Instead, he sought to admit evidence that he and his child's mother argued because Diedra had an affair with Bibb, and that because of this affair, Roberson was no longer friends with Bibb on the day of the murder. Thus, it would have been unlikely, and perhaps unbelievable, that Roberson asked Bibb to commit a robbery with him when they were no longer friends.

There are several links in this logical chain that were not expressly stated by Williams during Roberson's offer of proof, but the inferences seem apparent to this Court from the context of the testimony and arguments of the parties.[8]

---

[8] KRE 103(a)(2) requires that if the trial court's alleged erroneous ruling is one excluding evidence, the party seeking to admit the evidence must make an offer of

However, because Roberson did not offer a specific statement that he wished to admit, and the Commonwealth did not identify a specific statement it sought to exclude, the trial court's ruling on this issue is difficult to review. Regardless, any error in the exclusion of this evidence would have been harmless.

Under the harmless error rule and pursuant to RCr 9.24, we will not reverse a conviction based on a preserved error "if we can say with fair assurance that the judgment was not substantially swayed by the error." *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010). In this case, the crux of the evidence Roberson sought to admit through this portion of Williams's testimony is that Roberson and Bibb were no longer friends at the time Bell was murdered. Although Roberson was prohibited from admitting evidence of *why* they were no longer friends, he successfully placed before the jury the *fact* that they were no longer friends. Because this key piece of information was admitted, we cannot conclude that the simple exclusion of why they were not friends "substantially swayed" the verdict.

## D. Cross-Examination of Natasha Williams

Roberson next argues that the trial court erred by allowing the Commonwealth to assert that Williams was both lying during her testimony as well as committing perjury. Williams testified on direct examination that Roberson was at her house all night on the night of the murder and did not leave. Thus, he could not have gone to Russellville to commit the robbery and

---

proof whereby "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

murder. On cross-examination, the Commonwealth questioned Williams about why she did not come forward to the prosecutor or the police with this alibi evidence prior to the trial date.

The cross-examination became heated, with Williams and the Commonwealth's Attorney often speaking over each other. Roberson's counsel interrupted and asked that the Commonwealth's Attorney allow Williams to answer the questions. A short time later, Roberson objected, and a bench conference was held. Roberson asserted that the Commonwealth's questioning was argumentative, and that the Commonwealth would not allow Williams to answer the questions. The trial court ordered the Commonwealth to "let her answer." Quickly thereafter, the tone of the cross-examination escalated again. The Commonwealth's Attorney asked Williams, "Isn't the real reason we didn't have [the alibi] information is because you wanted to make sure when you came in here and lied for your son, that we would hear it for the first time today?" Williams then asserted that the Commonwealth's Attorney had refused to speak to her. The Commonwealth's Attorney then stated, "I've never seen you before." Williams then stated that the Commonwealth's Attorney had seen her in the courtroom before and had even tried to get her in trouble for talking while court was in session. The Commonwealth's Attorney then said, "That is a lie that you are trying to tell the jury. Have you been advised of the penalties of perjury?" Again, Williams was speaking over him during this portion of the cross-examination.

Roberson objected on the grounds that the questioning was argumentative. The trial court overruled that objection. The Commonwealth's Attorney then asked Williams, "Have you been advised of the penalties of perjury, a felony, before you came in here today?" Roberson objected during this question, and the trial court sustained the objection as to the perjury comment. Roberson did not ask for an admonition or seek any further relief. The tone of the cross-examination subsequently calmed, and the examination eventually concluded without further significant incident.

To this Court, Roberson argues that the Commonwealth's questioning was improper because the Commonwealth's Attorney improperly accused Williams of lying and because the Commonwealth's Attorney sought to impeach Williams through what was essentially his own testimony. The Commonwealth asserts that these arguments were not preserved and should not be reviewed. While we agree with the Commonwealth that, because these specific issues were not presented to the trial court for a ruling, they were not preserved, we disagree that this lack of preservation prohibits us from reviewing the issues. Accordingly, we will review the Commonwealth's questioning for palpable error pursuant to RCr 10.26.

"For an error to rise to the level of palpable, it must be easily perceptible, plain, obvious and readily noticeable. Generally, a palpable error affects the substantial rights of the party only if it is more likely than ordinary error to have affected the judgment." *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013) (internal citations and quotation marks omitted). Even then, relief is

appropriate only "upon a determination that manifest injustice resulted from the error." RCr 10.26.

In this case, the Commonwealth apparently concedes error on both of these issues but asserts that palpable error did not result. The Commonwealth's explicit statement that Williams was "trying to tell the jury" "a lie" was plainly improper. "It [is] a clear rule of law that counsel cannot state that a witness or defendant is lying." *Commonwealth v. Padgett*, 563 S.W.3d 639, 650 (Ky. 2018) (citing *Sneed v. Burress*, 500 S.W.3d 791, 795 (Ky. 2016)). The Commonwealth violated this rule. Further, it was improper for the Commonwealth's Attorney to make himself a witness by making assertions of fact during his cross-examination of Williams, such as "I've never seen you before." This had "the effect of making a witness of the lawyer and allowing his or her credibility to be substituted for that of the witness" and is prohibited. *Holt v. Commonwealth*, 219 S.W.3d 731, 737 (Ky. 2007).

We now must determine whether those errors rise to the level of palpable error, necessitating reversal of Roberson's convictions. We hold that they do not. Although Roberson's defense centered, in large part, on alibi evidence, his mother was not the only person to offer that evidence. His sister, his sister's significant other, his aunt, and his wife all testified that they were with Roberson at Williams's house, during the timeframe of the shooting. They all testified that Kirk was not at the house, that they did not know who Kirk was, and that Roberson never left the house during the night between August 20 and 21, 2016. The Commonwealth did not similarly improperly question any of

23

those witnesses. Further, during deliberations, the jury asked to rewatch portions of Kirk's testimony and LaVonsaye's testimony, arguably showing that the jury's decision hinged more on LaVonsaye's alibi testimony than it did on Williams's alibi testimony. We simply cannot conclude that manifest injustice resulted from the Commonwealth's improper questioning of Williams.

## E. Evidence of Exculpatory Information

Roberson next argues that the trial court erred in excluding certain evidence he sought to admit through the testimony of LaVonsaye Roberson, Roberson's wife. Roberson sought to admit evidence that LaVonsaye had provided Facebook messages to law enforcement in which Jasmine Thompson admitted to killing Bell and planting the murder weapon in LaVonsaye's car. The trial court excluded the substance of the text messages based on hearsay. The court also excluded mention of text messages specifically, but allowed testimony that LaVonsaye provided exculpatory information, generally, to law enforcement. The trial court's rulings regarding the admissibility of evidence are reviewed for abuse of discretion. *Clark*, 223 S.W.3d at 95; *English*, 993 S.W.2d at 945. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581 (citing *English*, 993 S.W.2d at 945).

Roberson argues to this Court that the Commonwealth opened the door to LaVonsaye's testimony about the text messages by accusing Williams of lying about her attempts to contact law enforcement. He also argues the

evidence was relevant to prove law enforcement botched the investigation, in part, by failing to follow up on these Facebook messages. Finally, he argues that the messages were not hearsay because they were not offered for the truth of the matters asserted in them.

As previously discussed, hearsay is generally inadmissible. KRE 802. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). In this case, the substance of the text messages—that Jasmine Thompson admitted to killing Bell and planting the guns to frame Roberson—was hearsay, to the extent it was offered for the truth of the matter asserted. At the trial court, Roberson argued that the evidence was excepted from the hearsay rule because the text messages were statements against Thompson's penal interest pursuant to KRE 804(b)(3), however, he appears to have abandoned that argument on appeal. Instead, he merely argues that the text messages were not, in fact, offered for the truth of the matter asserted but instead were offered to rebut the Commonwealth's accusations that Williams was lying and to show that the police botched the investigation.

This Court agrees that the messages were relevant to rebut the Commonwealth's assertions that Williams lied in her testimony about attempting to contact law enforcement and provide information to them. However, the substance of the messages was not relevant for this purpose. Further, the fact that the information Williams and LaVonsaye sought to

25

provide the police was in the form of text messages was not of particular importance. The probative evidence was that Williams and LaVonsaye had exculpatory information that they sought to provide to law enforcement, and that they did, in fact, provide it to certain members of the Russellville Police Department. This evidence was admitted through LaVonsaye's testimony, and thus, there was no error in the exclusion of the text messages for this purpose.

The substance of the text messages, and the fact that the exculpatory information was contained in text messages, was also only of minimal probative value in Roberson's assertion that the police botched the investigation by failing to follow up on these messages. The jury heard testimony that the police received exculpatory evidence from LaVonsaye, specifically information that Thompson had planted the gun, and that the police had interviewed Thompson. This was sufficient, and the trial court's exclusion of further testimony about the text messages was not an abuse of discretion.

**F. Jury Sequestration**

Roberson next argues that the trial court erred in failing to properly sequester the jury as required by RCr 9.66.[9] Specifically, he argues that the trial court erred in allowing the jury to go home for the night during guilt phase deliberations and then leave the courthouse for a lunch break during the second day of deliberations. Although he asserts that he did not have the

---

[9] Roberson cites to RCr 9.68 in his brief, but the context of the argument makes clear he means RCr 9.66.

26

opportunity to object, he concedes that this alleged error is unpreserved and requests palpable error review under RCr 10.26.

The Commonwealth, on the other hand, argues that Roberson waived this issue by agreeing with the trial court's decision to allow the jury to go home for the night. It further asserts that because Roberson agreed with the first instance of jury separation, he implicitly agreed to the second separation for lunch.

Under KRS 29A.320(1), after the jury begins deliberating, "they shall be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court, subject to the Supreme Court rules permitting them to separate temporarily at night and for their meals." Under our Court's rules, however, "in the trial of a felony charge, after the case is submitted for [the jurors'] verdict, they shall be sequestered unless otherwise agreed by the parties with approval of the court." RCr 9.66.

In the case at bar, just prior to the jurors beginning their deliberations, the trial court instructed them to elect a foreperson and to let the court know how long they wanted to deliberate that evening, whether they wanted the court to order dinner for them, and when they wanted to go home for the night. The jurors then proceeded to the jury room to begin deliberating. The trial court stayed on the record for a short period of time so that the attorneys could determine what exhibits would go back to the jury room. Roberson made no objection to the trial court's instructions to the jury described above, and there was no discussion of sequestration.

27

Approximately one hour later, the trial record recording resumes, and the trial court indicates that it has received two notes from the jury. Pertinently, the first note said, "The jury would like to break and return in the morning." The trial court said, "The first one is really easy. . . . Obviously, that's what I told them." Again, Roberson does not object, and there is no further discussion of this particular issue. A few minutes later, the jury returns to the courtroom. The trial court admonishes the jurors that they should not discuss the case with anyone and should not undertake any independent research and investigation. The court then releases the jurors for the night.

After the jurors have left, the trial court asked the parties, "Anyone have any objections to the instructions I have given?" Roberson's counsel responded, "No, judge. I'm tempted to put them all in the Executive Inn, but your honor told them they could go home so I guess they can go home." By saying this, in addition to his failure to object at any point prior, Roberson's counsel effectively waived any objection he had to the trial court's failure to sequester the jurors after the case was submitted to them. We further conclude that Roberson's waiver of any objection to the trial court's failure to sequester the jury overnight extended to the lunch break the following day. Thus, we decline to review the issue any further.

Notwithstanding our holding on the issues presented to us, we are compelled to address the wisdom of requiring jurors to remain sequestered during the lunch break as an appropriate use of the trial court's discretion. This Court acknowledges the significant burden that jury service places on

28

individual jurors and their families. In order to reduce this burden, we understand a trial court's decision, assuming agreement of the parties, to allow jurors to return to their homes for the night when deliberations extend into the evening. However, we are significantly concerned with allowing jurors to separate during the lunch break. Requiring jurors to remain sequestered, under the watchful eye of court security, and bringing lunch to them, is a minimal additional burden on the jurors. However, it has a great impact, not only on maintaining the integrity of the trial process, but also on ensuring the safety and security of our jurors. The case at bar is a prime example of one fraught with violence, in which the jurors, and our system as a whole, would have been best served by requiring they remain in the jury room during the lunch break.

## G. Review of Testimony During Deliberations

Roberson next argues that the trial court erred in allowing the jury to rewatch only a portion of Reba Kirk's testimony. The Commonwealth, on the other hand, argues that the trial court's decision was an appropriate use of its discretion. Roberson adequately preserved this issue through his contemporaneous objection.

On the second day of deliberations, the jury sent out a note asking to review the testimonies of Kirk and LaVonsaye Roberson. After the jury had watched the Commonwealth's direct examination of Kirk and a portion of Roberson's cross-examination, the trial court took a lunch break. Upon return from the lunch break, the jury sent out another note indicating that they did

not want to watch the rest of Kirk's testimony and wanted to move on to watch LaVonsaye's testimony. Roberson objected, arguing that the jury should be required to watch at least the entirety of the cross-examination so that they did not place more weight on the direct examination than the cross-examination. The trial court overruled Roberson's objection, and after the jury confirmed they did not want to watch any more of Kirk's testimony, the court allowed them to proceed to watch LaVonsaye's testimony.

"The decision with respect to how much testimony to read or replay to the jury is within the sound discretion of the trial court and will not be overturned absent a clear abuse of discretion." *Harris v. Commonwealth,* 134 S.W.3d 603, 610 (Ky. 2004) (citing *Baze v.* Commonwealth, 965 S.W.2d 817, 825 (Ky. 1997)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co.,* 11 S.W.3d at 581 (citing *English,* 993 S.W.2d at 945). We have previously explained,

> [i]n exercising that discretion, the judge must balance the risk of emphasizing particular testimony against the need to obviate juror confusion. . . . A trial judge is only required to provide the jury with the requested portion of the testimony and has a duty to ensure that the trial is not unnecessarily prolonged. . . . A judge need not replay cross-examination when the answer to the jury's question lies in testimony given during direct examination.

*Harris,* 134 S.W.3d at 610 (citations omitted). In this case, the trial court only replayed the portion of Kirk's testimony that the jury wished to hear. After receiving the jury's note that it did not want to review anymore of Kirk's testimony, the trial court even went so far as to confirm that no members of

30

jury wanted to watch the rest of Kirk's testimony. We cannot hold the trial court abused its discretion in refusing to require the jury to watch portions of Kirk's testimony that it explicitly indicated it did not want to watch.

**H. Sentencing**

Finally, Roberson argues that the jury returned inconsistent sentencing verdicts, and that the trial court erred in sentencing him to the longer of the two recommended sentences. After the penalty phase of the trial, the jury deliberated and recommended the following sentences: life without parole for twenty-five years for the offense of murder (count 1), twenty years for first-degree robbery (count 2), five years for each of the nine counts of first-degree wanton endangerment (counts 3 through 11), and twenty years for attempted murder (count 12). The jury was instructed that it should recommend "whether any or all of the punishments which you have fixed . . . should be served concurrently (at the same time) or consecutively (one to begin after the completion of the other)." They were further instructed that "[c]onsecutive sentencing is subject to the following: A. That the aggregate of consecutive terms of years cannot exceed 70 years; and B. That no sentence may run consecutively with a life sentence."

The final instruction given to the jury was a "Concurrent or Consecutive Sentence Verdict Form." This verdict form stated as follows,

> We recommend that the punishment fixed for the Defendant under Counts ___, ___, ____, ___, ___, ___, ___, ___, ___, ___, ___, and ___ be served concurrently (at the same time) or consecutively (one after the other), in whole or in part, as follows:

31

CHECK AND COMPLETE ONE AND ONLY ONE OF THE
FOLLOWING:

1.□ We recommend that the punishment fixed for the
Defendant under Counts ___, ___, ____, ___, ___, ___, ___, ___,
___, ___, ___, and ___ be served concurrently (at the same
time).

2.□ We recommend that the punishment fixed for the
Defendant under Counts ___, ___, ____, ___, ___, ___, ___, ___,
___, ___, ___, and ___ be served consecutively, one after the
other. For [sic] a total of _____ years not to exceed 70 years
or life.

The form then had a line for the foreperson's signature and the date. The jury

filled in the first set of blanks with the numbers 1 through 12, for each of the

twelve counts. The jury then placed a checkmark in the box beside paragraph 2

and filled in the blanks with the numbers 1 through 12, for each of the twelve

counts. The jury filled in the final blank space of paragraph 2 with the number

70. Thus, the jury's sentencing recommendation regarding concurrent or

consecutive sentencing was, "We recommend that the punishment fixed for the

Defendant under Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 be served

consecutively, one after the other. For [sic] a total of 70 years not to exceed 70

years or life."

Roberson asserts that the jury's recommended sentence of life without

parole for twenty-five years on the murder charge is inconsistent with its

recommendation that all sentences run consecutively for a total of seventy

years. Even if the jury's recommended sentences were inconsistent, it would

not matter. The trial court has the final authority to determine whether

sentences for multiple offenses are to be imposed consecutively or

32

concurrently. *Benet v. Commonwealth*, 253 S.W.3d 528, 534 (Ky. 2008). Because this decision is not within the province of the jury and is solely within the power of the trial court after a recommendation from the jury, any inconsistency in the jury's verdict is inconsequential. Accordingly, the trial court did not err in sentencing Roberson to life without parole for twenty-five years on the murder charge, with all other sentences running concurrently to that one.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Logan Circuit Court.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Michael Lawrence Goodwin


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Kristin Leigh Conder
Assistant Attorney General